We have one case to be argued in this special session. It is Appeal No. 2009-1427, Sanofi-Aventis v. Sandoz. Council, when you are ready, you may proceed. And for the benefit of those who might later listen to the audio recording, please enter your appearance and let us know who you are and who you represent. I represent Dominic Conde for the plaintiffs, Sanofi and Debbie O'Farrill. Good morning. Good morning, Your Honor. May it please the Court. The issue here is a straightforward one. Do the 874 patent claims, which unquestionably only recite a compound, require the insertion of an HPLC limitation? What does optically pure mean? Optically pure relates to the amount of the wanted versus unwanted isomer. So optical purity relates to the amount of the D isomer versus the L isomer in the compound. Yes, but that doesn't answer my question. How do I interpret optically pure in these claims? Optical purity is interpreted if you look at the intrinsic evidence, as we told the district court, which was not part of the summary judgment motion. But we told the district court, when you look at the intrinsic evidence, optical purity means the sample has no unwanted isomer. With taking into account the limits of detection. And at the time the patent was filed, the limits of detection was 0.05% by weight. And there were two patents that were filed on the same day. One related to this compound claim. The other related to a process claim. And the compound patent referred to the process patent. And in the process patent, they said the limit of detection was 0.05% by weight. And that is what optical purity means. That's what we argued to the district court. In fact, the district court explicitly, in his opinion, said in footnote 6, that what optical purity means would be left for another day. He, in fact, said that optical purity wasn't an issue that he was considering in his opinion. But is it appropriate to refer to the process to interpret optical purity and not to refer to the process in terms of its necessity in the invention? Your Honor, the process, you can make impure product or pure product. The process doesn't make a difference. You can use HPLC and come up with impure product. You can use HPLC and come up with pure product. The 874 patent relates to the compound. And the inventors never distinguished the prior art based on how you made optical purity, optically pure compound. They only said our invention is different from the prior art because we have optically pure material and the Kidani reference ends up with impure material. But during the prosecution, you were going to be rejected over Kidani, correct? We were rejected over Kidani. And ultimately, you prevailed and you were allowed after you relied, in your discussion with the examiner, on the HPLC process. Why isn't that probative about whether or not you are indeed limited to this process? Well, Your Honor, in the file history, the examiner rejected the claims based on Kidani. The applicant said, we're different from Kidani both because Kidani has no expressed optical purity in it and Kidani doesn't allow you to come up with optically pure product inherently. And what the applicant said, if you look at our spec, we reproduced the Kidani example and we came up with 90% pure. That was enough to distinguish their claimed invention from the prior art. They went on to say, oh, by the way, if you had impure product, you could purify it using HPLC. That's all that statement says. It doesn't say, oh, by the way, the only way you can come up with pure product is by using HPLC. And, in fact, this is confirmed by the notice of… But everything in the spec is a reference to HPLC. I mean, you're right. We can parse the words as everybody has done throughout this case. But they might not have said the words exactly that, but the only thing they've ever indicated in any way, shape, or form is using the HPLC process to get optically pure, correct? Well, the examples use HPLC, but in the specification itself, it says HPLC is illustrative, may be used, and, in fact, the district court said it's representative, leaving open the possible… The issue in this case is composition claim, right? Correct. These are the method claims that are not at issue here. Correct. The only thing at issue is the composition claims, and the case law of this court is clear. If you claim a composition, if you show that claim compound is not disclosed in the prior art or not obvious, then you have the right to claim that compound. And if you claim the compound, it doesn't matter how an infringer later makes it, they still will infringe that compound. So I think to our reading of the spec, and the spec is very clear, actually, on this point, it says that in the title, in the summary, in the abstract, that what is being claimed, the invention, is optically pure oxalaplatin. It doesn't make any mention about the process in any of those sections of the specification. Is it incumbent upon us to assume that you prevail on your issue of whether you're limited to the particular process? Is the decision on what optically pure means in terms of the percentages and the numbers relevant as you go forward in this case? If you agree with us that the claim should not be limited to HPLC, then the district court will have to decide whether or not optically purity means our definition, which is 99.95% pure, or some of the other defendants are arguing that it means absolutely 100% purity, which all the experts in this case have said is an impossibility. Is anybody arguing that it's lower, that optically pure is lower? I mean, I know in play are obviously validity issues as well as infringement issues, so everybody's got an interest in coming out different ways depending on what we're arguing. But is anybody alleging or has anyone thus far alleged on the record that optically pure is something less than 99.95%? No, it's 99.95%, that's what we told the district court. The prior art, of course, is only 90% pure, so we would argue based on what we said in the spec, so there may be some range of equivalents in there and that could be argued later. Somebody is 96.69% or something, right? Yeah, that was a process that was done after our patent was filed, so it's not a prior art process. It's a post-art process, so what someone else came up with later after the fact I don't think is particularly relevant. But even if it was 99.69%, which I think is the precise number, even if that is the prior art, we still believe that the claim should be construed as being 99.95% by weight. The district court seemed to be persuaded by the defendant's arguments that the claimed optical purity was, quote-unquote, repeatedly attributed to the HPLC process. What is your comment to that? Well, Your Honor, clearly the applicants used HPLC to come up with optically pure product, but it's different to say, well, we used HPLC to come up with optically pure product, from saying the only way we could do it is by using HPLC. Does it make a difference that there may not be any other way to do it? Well, the art was aware of other potential ways of getting optically pure product, but they never did it. HPLC is not the only route. I think some of the discussion that went on during the briefing, it may be a little unclear at this point, but you can purify one of the intermediates back and then make it into optically pure oxaloplatinum, or you can make oxaloplatinum and then purify that. So those in the art, essentially the patent says, here's a way to make optically pure product, and they characterize it, which is very important. You need to know whether it's optically pure or not. Once you have that information, those skilled in the art could figure out other ways of making it. It's not uncommon. You have a compound claim, and then someone years later claims an improvement on the process of making it. Well, they still infringed the compound claim. It doesn't mean the compound claim should be modified by a process. It just means that you can come up with improvements and ways of making it later. And I would argue, and we do argue, that in fact that's what happened here. The inventors invented a compound. They were the first to discover this optically pure product. It was a very important product. None of the defendants want to make optically impure product. None of them say they even want to make 99.69% product. It's important for them to make 99.95% or greater. That's what the inventors invented, and they have a right to that compound. Just out of curiosity, if someone came up with a new process for making 99.99% optically pure, would they then be able to get a composition claim to the more optically pure composition? No, because our claims would cover all the way up to 100%. So if they went to 99.99% Really? How do your claims, would they enable up to 100%? Yes. Yes, they would enable up to 100%. Then how does Kidani not? Kidani doesn't enable because, first of all, the inventors repeated the Kidani process and only got 90% pure. In fact, one of the defendants in this case did the same thing, and they only got about 95% pure. So Kidani doesn't inherently result in the claimed invention. In fact, the defendants in this case But you've told us repeatedly that using the HPLC, you get 99.95% Or greater. Or greater, really? So HPLC can get 100%? Well, Your Honor, this is an issue that was being addressed by the district court, but the fact of the matter is that the 99.95% is based on the fact that there's a limited detection of these instruments. So if you have 100% purity on your instrument, what that really means is because the instrument can only detect up to 99.95%, the sample is somewhere between 99.95% and 100%. Now, as a practical theoretical matter, even defendants experts agree, you can't remove every single molecule. That's a practical impossibility. But the fact of the matter is our claims are 99.95% by weight or higher. So if someone made a compound, as you suggested, Your Honor, that was 99.99% by weight, they would still be within our claims. Yeah, well, you claim 100%, and then you want us to construe it or someone to construe it at some point to include 99.95% because you say that that's the only way to determine it, to detect it, or that detection for 100% has to allow that. Yes, Your Honor. Detection for 100% would allow this very small 0.05% amount of the wrong enantiomer to still be in the compound. Is there anything in the spec for this patent that gives us any guidance with respect to anything below 100%, anything referencing to detection or range? Yes, Your Honor. The spec makes reference. There were two patents that were found. Not the 642. Let's start with the 874 patent. Is there anything in the 874 spec that deals with this range with respect to detection? Well, the inventors were the same on both patents, and in the 874 they specifically say we filed this other patent application on the same time, and the HPLC method in both specifications is essentially the same description. It's about the HPLC itself. So the point would be, well, if they said in the one patent that this limit of detection issue exists, and it's clear that it does, defendants experts agree it does, then we argue that it's incorporated by reference. Excuse me, but in the 874 they talk about the problems with detection. Where is that in the spec? No, Your Honor. In the 874 they say that Except for referencing or There's no specific discussion. There's nothing. There's no specific discussion. The 642 that deals with Right. The 642. If you go to the 642, column 5, that's at the record. At least there's several versions of it. The one I'm looking at is at 4146. Got it. If you go to the 642, column 5, lines 24 to about 3132. And the last sentence, it says, The optical purity of the wanted, in this chemical formulation, is the L isomer, the wanted isomer, obtained was 100%. And then it shows that the unwanted was below 0.5%. And what that means is a little It may not be understandable to laymen, but what it's saying is that you could still have the unwanted isomer up to 0.5% by weight because we can't detect it. That's what this paragraph is directed to. That's what it means. So when we say 100%, what we really mean is that 100%, but everyone understands that because of the limits of detection, you could still have 0.05% by weight in the sample itself. And this is all, as I mentioned, this is an issue that was that's going to be, that's still before the district court. I see my time is up in terms of reserving time for rebuttal unless there's any other questions, I'd like to do so. All right, thank you. We'll reserve the balance of your time for rebuttal. Let's hear from the other side. Good morning. Mr. Ernst, I notice that you've decided to split your time with your co-counsel. And that's fine with me, as long as you don't wind up repeating yourselves. And the clock is going to run for the full 15 minutes, and I'm going to leave it up to you to leave sufficient time for your fellow attorney. With that admonition, please proceed. Thank you, Your Honor. Jim Hurst on behalf of Maine. May it please the Court. This patent rests entirely on two points that Sanofi emphasized to the PTO. First, Sanofi said that it discovered a problem. Contrary to known fact. That's what they said. Contrary to known fact, they discovered a problem with the conventional method of making oxali platinum. They said it didn't work. It won't produce optically pure material. Second, they said when we discovered that problem with the conventional method, we fixed it by adding an extra HPLC step, which they made clear was essential or required to get optically pure material. Where does it say essential or required? In a number of places, Your Honor. Starting with, for instance, the specification. We think under either the Anderson line of cases or the disclaimer line of cases, the experiments themselves, the four examples themselves make our point. Where is the language that amounts to a disclaimer like in Anderson? I guess there's two things. First, in the prosecution history itself, they used the term further steps beyond Kidani were required to obtain. I'm assuming you're talking about paper number 6 in the prosecution history. So why don't you tell me which sentence you want me to focus on. Is it the only after sentence? No. That's what your briefs were focusing on. So what sentence would you like me to focus on? If you look at appendix 2652, there's two sentences at the end of the paragraph that spill over from the previous page. 2652. I'm sorry. Start at 2651. I'm sorry. Appendix 2651. Do I have it right? There is no 2651 in my appendix. How about appendix 173? Yeah, 172 and 173. Page 3 and 4 of the response. Correct. Okay. If you start on page 3, you'll see. Kidani provides no evidence that a pure isomer... I'm sorry. Where are you? You're on ace 172. Is that page 3 of the... Yes. The very last sentence. Okay. Kidani provides no evidence that a pure isomer can be prepared or isolated. And in fact, the isomers described as being prepared by Kidani do not have the presently claimed optical purity. So point one is, and this is what they said in the spec too, we discovered a prior art method doesn't work. The conventional method doesn't give you optically pure material. And then they say, it is also not even, and there's an extra B there, so you can cross out that B. It is also not even obvious to one skilled in the art, absent the teachings of the present application, that the material of Kidani is not pure, and that further steps are even required for optical purity. Correct. Further steps, but it doesn't say that the HPLC is required for optical purity. I think in context, Your Honor, this is all in the same paragraph, where they say, only after, they didn't say after, they said only after, HPL resolution, in accordance with the teachings of the present application, was optical purity obtained. All in the same paragraph. But in context, it seems to me that the word only modifies after, not HPLC. But only after, meaning, look at the, Only after. This is the context of the, of the test that was done in the comparative example. And that actually brings me to the examples themselves, okay? They said, So far, your disclaimer isn't jumping out at me from these two pages, so there's something else I'm missing before you move on to the examples themselves. You better bring me to it. I think that when you read, we think that when you read this exchange, they start off by saying, the conventional method doesn't work. It says, and they point to their examples, right above the only after statement. They point out the fact that the prior art examples that they had, that they reproduced, didn't produce optically pure material. And then they say, Only after HPL resolution was optical purity obtained. And then, in the context of that conversation, they say, Kidani won't work. We discovered that. And that it was an invention to come up, to determine that further steps were required beyond Kidani. So they were saying, in context, we believe, that HPLC was required. But that, coupled with the experiments and the patent application, remember, they said, with the experiments, they did it four times. They did the conventional method four times. And it's a well-known method, this conventional method. They said it didn't work. They did conventional versus HPLC four times. They did conventional a number of different ways. Each time conventional was impure, each time the extra HPLC step produced the purity. And then, Table 1 of the patent, for instance, says, Before HPLC, impure. After HPLC, pure. What other possible point is Sanofi making with those tables and those experiments other than to show that the conventional method does not work by itself, and therefore, the extra HPLC step is required? Perhaps they're enabling. But they didn't make that argument, Your Honor. They said, You said, What else could they possibly be doing? I mean, they have to meet the enablement requirement, right? So they have to establish and demonstrate to the world how they're going to get this optically pure composition that they've claimed. But if that's all they wanted to do, all they had to do was show, Look,  and we got pure material. But they didn't, Your Honor. They were trying to prove something else. They needed to prove to get a patent that the conventional method didn't work. Because, remember, the examiner read Kidani the same way as the art did, that Kidani was reporting optically pure isomers. So to get their patent, they had to not only prove the HPLC method worked, they had to prove that the conventional method did not work, and that's classic disclaimer. I don't understand why you say that they had to prove that the conventional method didn't work. They're arguing that the product was different. The product was new and unobvious, and that they discovered and claimed the product of optical purity. Because, Your Honor, they had to admit, because it's what everybody believed, and Kidani reports, remember, isolated and purified DAC, which corresponds to isolated and purified oxaliplatin. So they had to prove that method, contrary to everybody's understanding, didn't work. It was an essential point to getting a patent. They didn't have to prove it didn't work. They had to prove that it resulted in a different product than the product they resulted in after applying HPLC. Well, you remember that everybody believed, they said it twice to the patent office, once in the spec, and once during the prosecution history, they said folks believed that Kidani produced optically pure material. So a critical element to getting a patent was to prove that method wouldn't work. Isn't that classic? To show that Kidani did not inherently disclose optical pure product. Well, not inherently. Remember, in the spec they weren't talking about anticipation or inherency. And in the prosecution history they were dealing with an obviousness issue as well. They were saying it wouldn't work and they said it point blank a number of times. The compound, this is column 3, 68 down to 42. The compound prepared by a conventional method is a mix of isomers. I'm sorry. Column 3. Column 3. Are you in the 874 patent? I am. Column 3. What line? The bottom of column 3 to the top of column 4. Under examples. Yes, under examples. Further in fact, that compound, see that last sentence there? Further in fact, that compound prepared by a conventional method is a mixture of optical isomers will be shown contrary to known facts. So they're saying the conventionally obtained material, that's what they termed it, the conventionally obtained material is not optically pure. That's what they said throughout. That's what they set out to prove and that's how they got their patent. And we use the conventional method. But this is not a patent on a method. This is a composition claim. This is like Anderson. This is like Chemie. In Anderson, it was a comparative composition. Yeah, but in Anderson and Chemie, the process was found to be required or that it was necessary. But here, there's nothing that I can see that suggests that the HPLC process was required. Well, if you look at the entire context of both the spec and the prosecution, that is exactly what they're arguing. They're saying the prior art conventional method doesn't work, therefore HPLC is required. We use the conventional method. We use precisely the conventional method as defined in the patent. The patent defines the normal method of making this product as resolution by tartaric acid followed by recrystallization. Well, what is critical in this invention? Optical purity or the method of obtaining optical purity? Sanofi said to the patent office it was the method of obtaining it because that method was required to achieving optical purity. I see that my time for my counsel... Can I just ask one really quick question? I don't want to... But just on the question we were asking the other side today, which is assuming we're not going to limit it to HPLC, have you put forth the definition of optically pure? I mean, have you ever advocated already in your papers before the district judge what the definition is? My client's proposed definition was the one that the district court  that it was a process-based limitation, Your Honor. So, that it was an HPLC-based limitation. Do you believe that the district court's insertion of the process limitation is his interpretation of optically pure in this case? I do think so. Yes, Your Honor. All right. I mean, it ends the case for everybody because everybody uses the conventional method. All right. Let's hear from your co-counsel. On the question of the disclaimer language, we agree that the only after HPLC resolution     prosecution history is a clear disclaimer and it does cite a clear definition of optically pure in this case. So, I would like to go back to the spec, which we also believe has all of the disclaimer language that Mr. Hearst referred to. Just as a shortcut, all of those quotes about the conventional method not working and HPLC working with citations to the 874 patent are on pages 25 to 26 of Sandow's case.  would like to see all of the rest of them, about 10 cases, that not only include a disclaimer but also, as Judge Lin pointed out, attribute the characteristic, Sanofi calls it a physical characteristic of optical purity, to the HPLC process, which would by itself require the claims to be limited to HPLC. But it's also interesting that Sanofi's claim construction that depends so heavily on the 642 patent for this .05 percent, which really isn't .05 percent, it's less than .05 percent. What the 642 patent says is below .05 percent. So we know that we should be north of 99.95 but we don't know how much. And we're told 100 percent is not possible so we're somewhere south of 100 percent but we don't know how much. It's interesting that the 642 patent also says in three places that these isomers cannot, that's a quote, cannot be used to give the court those sites so there's no confusion about it. It's A4142 at the abstract. This is the 642 patent again. A4144 at column 2 lines 19 to 23. A4145 column 3 lines 25 to 28. So now we have a claim construction from Sanofi that reaches for less than 0.05 percent, which is really not what they're saying. They want the full 0.05 percent from a patent that says you can't use a different method, don't even try and that is very consistent with the 874 patent which also in fairness says I think in eight places your complete resolution or your 100 percent resolution is by HPLC. So we think it is a very fair disclaimer case and to make the argument now through a portal which by the way that portal only incorporates the manufacturing method from the 642 patent, not this 0.05 percent that they are now clinging to but only the manufacturing method. So that 0.05 wouldn't come anyway but to take anything from that patent which says to us don't use another method to support a construction that says use any method you want would be contrary to the intrinsic record. It also establishes one more point though. Whatever optically pure means and Sanofi makes this case too. Their expert and Sanofi argued in the district court any person of skill would look at the words optically pure and say no, it doesn't mean 100 percent and it doesn't mean complete. It means some process that is described in the patent specification. We now know that that process is not going to give you 100 percent because Sanofi tells us 100 percent isn't possible. We are also told 99.69 is not good enough. 99.95 for reasons that don't make sense, that will work for them. Why do you mean reasons that don't make sense? Because the 642 patent says you know. So it would make sense if they said greater than 99.95. That might make sense but we don't know how pure and it matters. And what this establishes is that there is no definition of optically pure that is quantitative. Not on this record, not on this intrinsic record and really not on the extrinsic record either. The only definition is qualitative and through the method. So this is not only a patent that says my characteristic that is so important, optical purity, is attributed to HPLC. It is a claim term that depends for its meaning on the process because the only thing we know in this again is the words of Sanofi's own expert, optical purity was obtained by collecting HPLC fractions at the appropriate time. That is all we know optical purity means. What is collected at those fractions. Does optical purity have any meaning or understanding to those of ordinary skill in  general art? What we are told is and there is no dispute. I'm not talking about this specific invention but just in this general art. Not a quantitative one. Sanofi has said could be 95% depends on the context but that's the important thing. It is agreed a person of skill would look at the words optically pure and look for context and here the only context is qualitative not quantitative and these are Sanofi's experts words by collecting HPLC fractions at the appropriate time. That's the only definition that would be true. Why does the HPLC process provide exactly the quantitative context? Because it's a mystery. We don't know what it is. We know it's less than 100. We don't know. To say that it's less than  not true. We have lots of patents about approximately. People of skill in the art are capable of figuring these things out. We're not those people necessarily but they are capable. But in this case what these inventors really claimed was the purity that I get when I use  method. And we went to that now. Especially when we're talking about the difference between 99.69 and 99.95. To carve that up with people who say it's not possible to do that because we don't know how much less than 100 percent it should be would not be right. And it would be contrary to this record especially with the 642 patent saying don't even try to use another method. Don't even try. Because the isomers are too structurally similar to separate a different way. Thank you. Thank you very much. I have just a very few questions.  believe the 642 patent says you can't resolve the product. The problem with what she said is that you can't resolve oxaloplatinum. You can't use the conventional method. Kadani doesn't use his resolution process on oxaloplatinum. He used it on pure product. But you can resolve the intermediate. It didn't work. It didn't result in pure product. I want to make sure that's clear on the record. The other thing is with regard to the amendment that everyone is focused on today I think it's also important to look at what the examiner said after that amendment was filed. He allowed the claims. He said Kadani does not teach oxaloplatinum as optically pure isomer. The instant compound is patentable. The examiner revised the claims on his own. He changed the wording from high optical purity to optically pure. If he thought that HPLC was necessary for the claims he would have made that amendment as well. He obviously knew he was capable of doing it. He understood the art. He would have done the same thing but he didn't. That tells us that the examiner's understanding of the office action is consistent with the   highest standards of the law. I would like to say that I would like to say that I would like to say that I would like to say that I would like to say that I      I  like to say that I would like to say that I would like to support the committee 我是 against the amendment that they  opposed to because we need them back off the market we would make motion if we win here Mr. Hearst you get the last word . Regardless of how the appeal comes out the issue would have to be the D.C.  has declined to intervene . You don't want a quick decision Mr. Hearst? On this one? If you want to give us a quick decision that would be fine but there is another step that Sanofi declined to take below. As you will see from the things we have been talking about there is prior art . In the record it is 212829 . It is 1987 work   It is   quick  .   a very quick decision . It is not a quick decision . It is a very quick decision . It   a quick decision .